UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHANCE SIMS and NOVELLA
COLEMAN,

               Plaintiffs,

      v.

LAKESIDE SCHOOL,

               Defendant.

CASE NO. C06-1412RSM

ORDER GRANTING DEFENDANT'S
MOTION FOR PARTIAL SUMMARY
JUDGMENT AND MOTION TO
STRIKE AND DENYING
PLAINTIFF'S MOTION TO STRIKE

## I.  INTRODUCTION

This matter comes before the Court on defendant's Motion for Partial Summary Judgment.  (Dkt. #202).  Defendant Lakeside School ("Lakeside") moves the Court to dismiss plaintiff Novella Coleman's ("Ms. Coleman") claims of racial discrimination in their entirety. Specifically, Lakeside argues that Ms. Coleman does not have hostile environment or disparate treatment claims under RCW 49.60.  Likewise, Lakeside argues that Ms. Coleman does not have hostile environment or disparate treatment claims under 42 U.S.C. § 1981.  Ms. Coleman responds that extensive evidence exists to create genuine issues of material fact.  To support her argument, Ms. Coleman provided the Court with a Federal Rule of Evidence ("FRE") 1006 Summary.  Lakeside moves to strike this summary on the grounds that it is an overt attempt to circumvent the page limits set by this Court's Local Rules.  Ms. Coleman, in her surreply, also seeks to strike the declarations attached to Lakeside's reply.

For the reasons set forth below, the Court GRANTS defendant's Motion for Partial

Summary Judgment, GRANTS defendant's Motion to Strike, and DENIES plaintiff's Motion to Strike.

## II.  DISCUSSION

### A.  Background Facts

The instant civil action arises out of an allegedly racist and hostile work environment created by Lakeside while Ms. Coleman and fellow co-plaintiff Chance Sims ("Mr. Sims") were employed at Lakeside as teachers.[1]  Ms. Coleman, an African-American, alleges that during her employment with Lakeside, she "complained about [Lakeside's] lack of support for teachers of color who were subjected to unfair criticism of students and parents."  (Dkt. #11, Plaintiffs' Complaint, ¶ 61).  Despite voicing her concerns, Ms. Coleman alleges that Lakeside failed to take action.  (*Id.* at ¶ 64).  To support her argument, Ms. Coleman points to the two specific instances where she experienced racially motivated behavior, and general allegations that a pervasive culture of racism existed at Lakeside.  Accordingly, the Court discusses the relevant facts below.

#### 1.  Ms. Coleman's Specific Allegations of Racially Motivated Behavior

Ms. Coleman began teaching at Lakeside in September of 2005 in Lakeside's Upper School math department.[2]  (Dkt. #11, Plaintiffs' Complaint, ¶ 56).  Within the first three weeks of Ms. Coleman's employment, parents of students in Ms. Coleman's classes began calling Ms. Coleman's department chair, Dean Ballard ("Mr. Ballard"), to raise concerns about Ms. Coleman.  (Dkt. #246, Ex. D, Dep. of Coleman, 250:19-251:20).  In particular, one very concerned mother wrote an email on September 28, 2005, to the principal of the Upper School, Than Healy ("Mr. Healy").  (Dkt. #213, Decl. of Parent A, ¶ 16).[3]  Parent A indicated

---

[1] In its partial summary judgment motion, Lakeside seeks only to dismiss Ms. Coleman's claims.

[2] Lakeside is divided into an Upper School and a Middle School.  The Upper School is comprised of grades 9-12, and the Middle School is comprised of grades 5-8.

[3] Pursuant to this Court's Order granting in part defendant's Motion for Protective Order (Dkt. #253), the parties have been directed to substitute both minor child's names as well as their parents in order to ensure the protection and privacy of the minor children involved in this case.

MEMORANDUM ORDER
PAGE - 2

that her daughter, Student A, was suffering severe frustration in Ms. Coleman's Algebra II

class. (*Id.* at ¶ 17). The mother specifically wrote:

> [My daughter] has always had significant math anxiety . . . and having her weakest
> subject at the end of the day is already a bad idea. Add to that the fact that her
> learning style does not mesh with Ms. Coleman's teaching style and you have a recipe
> for tremendous emotional stress (not to mention academic failure) . . .
>
> Undoubtedly Ms. Coleman is a fine teacher and I know [my daughter] thinks that she
> is a nice person and appreciates her efforts to help but this is a bad academic match.
> It's not that we expect every teacher-student match to be ideal but this is extreme as
> she is having severe stress reactions at home (stress induced vomiting, interrupted
> sleep, etc.). The things we have never seen in [my daughter] before. Empathy for her
> situation would be appreciated as I can see we are on the cusp of some very big
> problems here and I am deeply worried about [my daughter].

(*Id.*, Ex. D).

    As a result, Parent A asked Mr. Healy to transfer her daughter out of Ms. Coleman's

class. (*Id.* at ¶ 16). Mr. Healy rejected this transfer request, indicating that Lakeside did not

allow students to transfer from one class to another based on teacher preference. (*Id.* at ¶ 17).

Ms. Coleman also attempted to reach out to Student A, indicating that she "had tried talking

to Student A like more one-on-one" and "tried asking if she had questions when she was

saying things were confusing in the middle of a lecture." (Dkt. #246, Ex. D, Dep. of

Coleman, 263:10-14). Ms. Coleman also asked Student A to come to office hours. (*Id.* at

263:15). Despite her efforts, Ms. Coleman alleges that Student A made a racist and offensive

remark to her. Ms. Coleman described the circumstances in her deposition as follows:

> A:   I was in my class teaching, and one of my students - I was like teaching
>       something new at the board, so I was writing on the white board, and one of
>       my students raised her hand, and she asked me if I had written something
>       incorrectly on the white board, and so I looked at it and said, ["] You know
>       that's possible. Let's look at it together and see if we can figure out if what I
>       wrote made sense.["]
> Q:   Why did you think that was racist?
> A:   I think when she did that, like the first thing I noticed is that she doesn't -
>       that's not how she speaks to other people in the classroom. Like I had never
>       heard her do that before. I had never seen her snap her fingers before. I had
>       never seen her like wag her head like that before. Her intonation was
>       completely different - and I felt like she was imitating a stereotype of black
>       woman when she did that.

MEMORANDUM ORDER
PAGE - 3

1   (*Id.* at 231:20-232:18).

2         Additionally, Ms. Coleman claimed that Student A had made previous offensive

3   comments and gestures during class.  Ms. Coleman testified that "like there were lots of times

4   where [Student A] made lots of dramatic body gestures and said that I was confusing her or I

5   didn't make sense at times that didn't seem appropriate to me." (*Id.* at 258:8-11).  Ms.

6   Coleman also alleges that Student A's parents were racist towards her.  Ms. Coleman's

7   deposition provides:

8         Q:      [D]id you believe that the sole reason that [Student A's] parents were calling
                  to complain was because of your race?
9         A:      At what time?
          Q:      At any time.
10        A:      Yes.

11  (*Id.* at 246:24-247:6).

12        Ms. Coleman reported these incidents to Mr. Healy shortly thereafter.  (*Id.* at 264:17-

13  23).  In response, Mr. Healy met with Student A's parents.  (Dkt. #208, Decl. of Healy, ¶ 5).

14  Both the parents of Student A and Student A denied being disrespectful to Ms. Coleman in

15  any way.  (*Id.*).  Nevertheless, Mr. Healy ultimately determined that it was appropriate to

16  transfer Student A to a different algebra class.  (*Id.* at ¶ 6).  No further incidents occurred

17  between Ms. Coleman and Student A.  (*Id.* at ¶ 7).  Ms. Coleman alleges that Mr. Healy's

18  response was focused more on "getting complaints from Student A's parents to stop rather

19  than resolving my concern about racial discrimination." (Dkt. #232, Decl. of Coleman, ¶ 5).

20        Ms. Coleman also felt she was being attacked by other parents who raised concerns

21  about their children's experiences in her classroom.  Ms. Coleman indicates that Mr. Ballard

22  told her that he had received complaints from the parents of three other students in her

23  Algebra II class, including the parents of Student C, Student D, and Student E.  (Dkt. #246,

24  Ex. D, Dep. of Coleman, 252:22-254:25).  Ms. Coleman argues that these complaints were

25  unfounded because the methodology and pedagogy that she employed were also being used

26  by white faculty, as well as by an Asian-American teacher, Scott Ogawa ("Mr. Ogawa").

27  (Dkt. #248 at 5).  Despite the similar teaching styles, Ms. Coleman alleges that she was being

28  singled out, because no complaints were made against Mr. Ogawa.  (*Id.*).

MEMORANDUM ORDER
PAGE - 4

1      One month after Ms. Coleman began teaching at Lakeside, she gave notice to

2 Lakeside through an email to Bernie Noe ("Mr. Noe"), the Head of School at Lakeside, that

3 she did not intend to return for the second semester. She stated that:

> After my initial visits at Lakeside, I thought I came away with an accurate but hopeful
> picture of where the school is at regarding the mission focus. However, after two
> months of working here I now know differently . . . In my daily experience, the
> diversity I bring in terms of my ethnic culture and my views about the teaching and
> learning of mathematics has not been received well.

7 (Dkt. #206, Decl. of Noe, Ex. A).

8      In response, Lakeside contends that it sought to retain Ms. Coleman and attempted to

9 resolve Ms. Coleman's concerns in a variety of ways. First, Mr. Noe met with Ms. Coleman

10 and encouraged her to stay to work on her concerns. (*Id.* at ¶ 3). Second, Lakeside assigned

11 a new mentor to Ms. Coleman, Lisa Kramer ("Ms. Kramer"). (Dkt. #208, Decl. of Healy, ¶¶

12 8-10).[4] Third, Mr. Healy set up meetings with Ms. Coleman designed to give her an

13 opportunity to promptly raise concerns or bring problems to his attention. (*Id.* at ¶ 14).[5]

14 These meetings occurred on a regular basis from January to June of 2006. (*Id.*). Fourth, Mr.

15 Noe also requested that Ms. Coleman serve on a newly formed diversity committee to address

16 issues of race and class at Lakeside. (Dkt. #206, Decl. of Noe, Ex. E). Ms. Coleman joined

17 the committee but withdrew soon thereafter, stating that "[a]s I will not be at Lakeside next

18 year and I often regret my decision to stay for the rest of the year, it does not make sense for

19 me to be on this Committee." (*Id.*). Lastly, Lakeside approved a request from Ms. Coleman

20 seeking approval to attend a National Education Association Minority Leadership Program in

21

22      [4] Ms. Kramer sat in on at least one of Ms. Coleman's classes. (Dkt. #232, Decl. of Coleman, ¶¶ 8,

23 9). Ms. Coleman contends that Ms. Kramer "asked me if I wanted her to come again and I said I didn't
think it was necessary at that point in time because I did not see the reason." (*Id.*). She also contends that

24 it was not her idea to change mentors. (*Id.* at ¶ 22).

25      [5] Mr. Noe also arranged to meet with Ms. Coleman on a regular basis to give her an opportunity to

26 raise any concerns. (Dkt. #206, Decl. of Noe, ¶ 4). However, Ms. Coleman stopped meeting with Mr. Noe
because she felt that the meetings were not productive. *Id.* Ex. B. She also stated that she was "confident

27 that any of [her] immediate concerns can be addressed and acted upon in [her] regular meetings with [Mr.
Healy]. (*Id.*).

28

MEMORANDUM ORDER
PAGE - 5

Hawaii, agreeing to fund the trip as well.  (*Id.* at ¶ 5).

Meanwhile, Ms. Coleman alleges that around February of 2006, she experienced another racist and offensive remark by a student in her class.  Ms. Coleman testified:

> A:  When I was near Student F's group, he asked me how I got into Stanford, and he followed up by asking if I'd gotten an athletic scholarship.
> Q:  What's Student F's race?
> A:  Student F is Asian.
> Q:  What was your response?
> A:  I said, no, I hadn't gotten an athletic scholarship.
> Q:  And what led you to believe that he asked you those two questions because of your race?
> A:  The - there's a stereotype that African American people are good athletes, and related to that is the idea that African American athletes get into schools that they are not academically qualified to get into because of their athletic skills and not because of their academic qualifications.
> Q:  Any other reason that you believed that Student F asked those questions because of your race?
> A:  Because I'm African American, and that was the stereotype that I thought he was referring to.

(Dkt. #246, Ex. D, Dep. of Coleman, 319:3-18).

Lakeside contends that Mr. Healy met with Student F after Ms. Coleman reported the student's question to Mr. Healy.  (Dkt. #208, Decl. of Healy, ¶ 15).  Mr. Healy determined that the student was sincerely asking about how he might be able to get into a school like Stanford and that he did not intend to offend Ms. Coleman.  (*Id.*).  Ms. Coleman alleges that "I told [Mr. Healy] that Student F had not apologized or mentioned the incident" but that "[Mr. Healy] did not follow up on this."  (Dkt. #232, Decl. of Coleman, ¶ 21).

In addition to these events, Ms. Coleman identifies three other specific instances where she claims she was treated differently because of her race in her responsive brief.  First, Ms. Coleman contends that "Bernie Noe physically protects white staff person, Lisa Sanders ("Ms. Sanders"), but administration fails to protect Novella Coleman who reported feeling unsafe."[6] (Dkt. #248 at 7).  This allegation stems from a January 3, 2006 meeting wherein Ms. Coleman and fellow co-plaintiff Mr. Sims, along with other faculty, were invited by Mr. Noe to "discuss

---

[6] Plaintiff's counsel cites Exhibit 37 and the deposition of Kimberly Pollock on p. 71 and p. 181 to support this proposition.  However, an examination of these documents does not make any reference to these events.

MEMORANDUM ORDER
PAGE - 6

how different faculty members experience Lakeside" and "provide the opportunity for a full

range of viewpoints and informed discussion on these issues." (Dkt. #208, Decl. of Noe, ¶ 7).

During this meeting, co-plaintiff Mr. Sims apparently made aggressive gestures towards Ms.

Sanders. (Dkt. #246, Ex. D, Dep. of Coleman, 171:7-172:5). Mr. Noe subsequently asked

Mr. Sims to apologize to Ms. Sanders, and Ms. Coleman alleges that this conduct offended

her. (Dkt. #232, Decl. of Coleman, ¶ 49). She states that "I was stunned, and overwhelmed.

I felt that because I was black, I could not trust [Mr. Noe]. I felt like it was an abuse of

power by [Mr. Noe] and that he was racially biased. I was offended, and felt immobilized by

[Mr. Noe's] behavior." (*Id.*). Second, Ms. Coleman alleges that during this meeting, Ms.

Sanders twice perpetuated a negative racial stereotype by "confusing and using incorrect

names to address African Americans Rachel Finn and Novella Coleman although they do not

look similar." (*Id.*). Ms. Coleman further contends that Ms. Sanders never apologized.

(*Id.*). Lastly, Ms. Coleman also indicates that "[w]hite faculty member Parent D manipulation

of her son's grade in plaintiff Coleman's class goes without an apology whereas [Mr. Noe]

demands African American faculty (Chance Sims) to apologize to white staff (Lisa Sanders)."

(*Id.* at 8).

## 2. Ms. Coleman's General Allegations of a Racist Culture at Lakeside

     In addition to the specific events mentioned above, Ms. Coleman also indicates in her

responsive brief that there was a pervasive and underlying culture of racism towards African-

Americans as a whole at Lakeside. The responsive brief lists the following facts as examples[7]:

     a.     An African American Administrator stated that Bernie Noe "had issues with
            black people and particularly black women."

     b.     African American Administrator Rachel Beare worried about her hair as an
            African American woman. This is the same as the complaint that Adrienne
            Miller made against Bernie Noe for race discrimination.

---

     [7] Notably, there is no "Statement of the Facts" section in Ms. Coleman's responsive brief, nor is
there any attempt to organize the background facts of this case other than providing the Court with this list.
The list is replete with grammatical errors, and the Court restates this portion of Ms. Coleman's brief
verbatim. In addition, the citations supporting these facts have been omitted.

MEMORANDUM ORDER
PAGE - 7

c.   The qualifications of African American faculty were challenged by white parents and students.

d.   African American hires were questioned as "affirmative action" hires.

e.   African American student disciplined more harshly than wealthy white student.

f.   White students engaging in racially motivated behavior that did not cease while such behavior was not observed against white faculty.

* * *

I.   African American faculty member Kim Pollock requested "discussions about race" and the request is ignored; white faculty member Jodi Rockwell requested a discussion and she received an immediate response.

j.   Bernie Noe does not generally respond to faculty members emails to "all faculty" but does to white faculty.

k.   Faculty of color is told by whom to sit and not (do not sit by certain African American faculty members) or else face repercussions.

l.   Administration very careful in how to craft the response to white faculty member's request for discussion on race (Jodi Rockwell) so as not to admonish Rockwell and be careful of her feelings while African American faculty are silenced, marginalized and/or disciplined.

m.   White faculty member requests a meeting, Jodi Rockwell, and one is scheduled - African American faculty member Rachel Finn requests a meeting about a discussion on racial bias and stereotype and Noe refuses her request.

n.   Negative reactions, marginalization, silencing, and racial bias when African American faculty speaks.

o.   Rescinding the invitation to D'Souza: a white faculty member, David Rosengren first suggested rescinding the invitation yet African American faculty member Chance Sims takes the "fall."

p.   Administration's obvious support for white faculty and staff but for faculty of color.

q.   Administration's public apology to white staff member for behavior in January 3, 2006 meeting but no public apology to any faculty or staff of color.

r.   Bernie Noe demands that African American faculty (Chance Sims) apologize to white faculty/staff (Lisa Sanders) while he does not demand that white faculty (Doug Porter) apologize to Chance Sims for his verbal aggression in the January 3, 2006 meeting.

s.   Noe demands that Chance Sims apologize to white staff member Lisa Sanders for comment yet does not demand that white faculty member Doug Porter apologize to Chance Sims for becoming physically aggressive towards him in the January 3, 2006 meeting.

t.   White faculty member Doug Porter is not disciplined for his physically

MEMORANDUM ORDER
PAGE - 8

aggressive behavior toward African American Chance Sims in the January 3, 2006 meeting yet Noe demands that Chance Sims apologize to Lisa Sanders.

* * *

w.    African American faculty member Chance Sims placed on probation for sending all faculty email reiterating concerns of racial discrimination, harassment and bias on campus.  Defendant claims that he was placed on probation for sending the email to "all."  White administrator Than Healy responded to the email to "all" and was not disciplined.

x.    Noe reprimanding African American administrator TJ Vassar for characterized a white parents commentary as white superiority.  White faculty and administrators voicing that white parents are abusive are not disciplined.

y.    African American student complaints about behavior of white students go unaddressed.

z.    African American students are treated differently on campus by white faculty.

aa.    African American students pain, feelings of failure, isolation, and not fitting not addressed over time.

bb.    Administrators treat African American students differently than white students.

cc.    Administration treats African American parents differently than white parents.  If white parents (Parent A, B, C) want to meet with administration, they are welcomed to do so yet when an African American parent (Student W's mother) present at a meeting, Administration becomes angry and says the parent is not to be there.

* * *

ee.    Administration investigates the claim of a white cafeteria worker even though the complainant had already tendered her resignation while the numerous complaints over the years from African American faculty, staff and administrators about racial bias, discrimination and/or harassment are neither investigated nor remedied.

ff.    Administration treats African American members differently than white members in the terms of conditions of African trip.

(Dkt. #248 at 4-8).

Ms. Coleman also states in her declaration that racially motivated behavior by students did not cease during her tenure at Lakeside.  (Dkt. #232, Decl. of Coleman, ¶ 47).  She states that such behavior "occurred every week and on average three to four times per week."  (*Id.*).  In addition, Ms. Coleman states that racially motivated behavior by parents also did not cease, stating that she "did not notice a decrease in the disrespectful interactions I had with parents[.]"  (*Id.* at ¶ 48).  Eventually, Ms. Coleman sent an email to the entire faculty and staff

MEMORANDUM ORDER
PAGE - 9

1   at Lakeside on April 19, 2006, announcing her plans to leave Lakeside and teach at a public

2   high school in East Palo Alto, California.  (Dkt. #246, Ex. 92).

3        Against this backdrop, Ms. Coleman, along with Mr. Sims, filed a complaint against

4   Lakeside on September 6, 2006.  In their complaint, Ms. Coleman and Mr. Sims allege that

5   Lakeside violated RCW 49.60 and 42 U.S.C. § 1981 by creating a racially hostile work

6   environment, and by engaging in disparate treatment.[8]  (Dkt. #11, Plaintiffs' Complaint, ¶¶

7   5.1-8.5).  After nearly a year of discovery, Lakeside now moves for partial summary

8   judgment, seeking dismissal of Ms. Coleman's claims in their entirety, with prejudice.[9]

9        **B. Defendant's Motion to Strike Plaintiff's FRE 1006 Submission**

10       As an initial matter, the Court discusses the admissibility of Ms. Coleman's FRE 1006

11   submission in support of her responsive brief.  FRE 1006, titled "Summaries," provides:

12       The contents of voluminous writings, recordings, or photographs which cannot
         conveniently be examined in court may be presented in the form of a chart, summary,
13       or calculation.  The originals, or duplicates, shall be made available for examination or
         copying, or both, by other parties at a reasonable time and place.  The court may order
14       that they be produced in court.

15   *Id.*

16       It is well established that FRE 1006 is an exception to the best evidence rule.  *See U.S.*

17   *v. Weaver*, 281 F.3d 228, 232 (C.A.D.C. 2002).  The purpose of FRE 1006 is "to allow the

18   use of summaries when the volume of documents being summarized is so large as to make

19   their use impracticable or impossible; summaries may also prove more meaningful to the judge

20   and jury."  *U.S. v. Johnson*, 594 F.2d 1253, 1255 (9th Cir. 1979).  The burden is on the

21   proffering party to show that the summary is admissible.  *Amarel v. Connell*, 102 F.3d 1494,

22   1516 (9th Cir. 1996).  FRE 1006 should not be used as a back-door vehicle for introduction

23   of evidence which is otherwise inadmissible.  *Peat, Inc. v. Vangaurd Research, Inc.*, 378 F.

24   3d, 1154, 1160 (11th Cir. 2004); *see also U.S. v. Scales*, 594 F. 2d 558, 562 (6th Cir. 1979)

26   [8] Mr. Sims also avers a separate complaint for retaliation under RCW 49.60, but Ms. Coleman does not.

27   [9] The Court entertained oral arguments with respect to this motion on December 18, 2007.

28

MEMORANDUM ORDER
PAGE - 10

1   (holding that under FRE 1006, the summary or chart must be accurate, authentic, and

2   properly introduced before it may be admitted into evidence).   Summary of purely testimonial

3   evidence is, strictly speaking, not within the purview of FRE 1006; the purpose of the

4   summary is to aid the fact-finder in its examination of evidence already admitted.   *See U.S. v.*

5   *Winn*, 948 F. 2d 145, 158, n.6 (5th Cir. 1991); *see also U.S. v. Grajales-Montoya*, 117 F.3d

6   356, 361 (8th Cir. 1997) (finding that Rule 1006 does not allow for the admission of a

7   summary that restates and distills other properly admitted exhibits; "such a summary is a

8   written argument").

9        In this case, Ms. Coleman has not met her burden of showing why her FRE 1006

10  submission should be admissible.   She states that the evidence supporting her responsive brief

11  is voluminous and cannot conveniently be examined in court.   (Dkt. #247 at 1).   Thus, she

12  indicates that she has "prepared and [submitted] for the Court's use the attached summary

13  pursuant to [FRE] 1006."   (*Id.* at 1-2).   However, the majority of the summary is based on

14  declaration testimony which Ms. Coleman characterizes into an argument.   For example, the

15  summary includes statements such as "[d]efendant knew or should have known of the multiple

16  complaints from [plaintiffs] and others about racial discrimination, racial bias, and racial

17  harassment in defendant's workplace from as early as 2002 when race discrimination

18  complaints were made directly against Bernie Noe, Head of School."   (*Id.* at 14).   The

19  summary also states that "[d]efendant did not intend to address racial bias, discrimination or

20  harassment."   (*Id.* at 44).   Additionally, the summary states, "[f]rom as early as 2002,

21  Directors knew that faculty imposed discipline disparately depending upon race."   (*Id.* at 48).

22  These statements are not the type of objective summary of the evidence which is contemplated

23  by FRE 1006.   Rather, the summary is argumentative in nature and should normally appear in

24  the body of a brief.   As *Winn* indicates, a summary of testimony evidence is not within the

25  purview of FRE 1006.   Consequently, the Court grants Lakeside's Motion to Strike, and Ms.

26  Coleman's FRE 1006 submission shall be stricken.   Ms. Coleman is ultimately not prejudiced

27  by the Court's ruling in this regard, because she has submitted the underlying evidence which

28  her summary is based upon, and the Court has reviewed this evidence in analyzing the instant

MEMORANDUM ORDER
PAGE - 11

1    motion.

2        **C.  Ms. Coleman's Motion to Strike**

3        Ms. Coleman, in her surreply, moves to strike the four declarations attached to

4    Lakeside's reply.  Ms. Coleman states that "[t]hese declarations are too late for [her] to

5    respond to with evidentiary material" and that the declarations "confirm[] that genuine issues

6    of material fact exist precluding summary judgment."  (Dkt. #269 at 1).  However, Ms.

7    Coleman presents no legal authority for her position.  In any event, this Court's rules clearly

8    allow a moving party to attach declarations in support of a reply brief.  *See* Local Rule CR

9    7(b)(3).  Accordingly, Ms. Coleman's Motion to Strike shall be denied.

10       **D.  Standard of Review on Summary Judgment**

11       Summary judgment is proper where "the pleadings, depositions, answers to

12   interrogatories, and admissions on file, together with the affidavits, if any, show that there is

13   no genuine issue as to any material fact and that the moving party is entitled to judgment as a

14   matter of law."  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247

15   (1986).  The Court must draw all reasonable inferences in favor of the non-moving party.

16   *See F.D.I.C. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992), *rev'd on other*

17   *grounds,* 512 U.S. 79 (1994).  The moving party has the burden of demonstrating the absence

18   of a genuine issue of material fact for trial.  *See Anderson*, 477 U.S. at 257.  Mere

19   disagreement, or the bald assertion that a genuine issue of material fact exists, no longer

20   precludes the use of summary judgment.  *See California Architectural Bldg. Prods., Inc., v.*

21   *Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987).

22       Genuine factual issues are those for which the evidence is such that "a reasonable jury

23   could return a verdict for the non-moving party."  *Anderson,* 477 U.S. at 248.  Material facts

24   are those which might affect the outcome of the suit under governing law.  *See id.*  In ruling

25   on summary judgment, a court does not weigh evidence to determine the truth of the matter,

26   but "only determine[s] whether there is a genuine issue for trial."  *Crane v. Conoco, Inc.*, 41

27   F.3d 547, 549 (9th Cir. 1994) (citing *O'Melveny & Meyers*, 969 F.2d at 747).

28

MEMORANDUM ORDER
PAGE - 12

1      **E.  Ms. Coleman's Claims under RCW 49.60**

2      The Washington Law Against Discrimination ("WLAD"), as codified by RCW 49.60,

3 was enacted in order to "protect the public welfare, health, and peace of the people of

4 [Washington] state," and to ensure that "practices of discrimination against any of its

5 inhabitants because of race" are prevented and eliminated.  *See* RCW 49.60.10.  In defining

6 discriminatory practices, the WLAD provides that "[i]t is an unfair practice for any employer .

7 . . [t]o discriminate against any person in compensation or in other terms or conditions of

8 employment because of . . . race."  *See* RCW 49.60.180.  In the instant case, and as noted

9 above, Ms. Coleman has brought hostile environment and disparate treatment claims under the

10 WLAD.

11      **1.  Hostile Environment Claim**

12      For a plaintiff to prove a hostile environment claim under the WLAD, she must

13 establish that: (1) the conduct complained of was unwelcome; (2) she was subject to

14 harassment because of her race; (3) the conduct affected the terms and conditions of her

15 employment; and (4) the conduct can be imputed to the employer.  *Davis v. West One*

16 *Automotive Group*, 140 Wn. App. 449, 166 P.3d 807, 811 (2007); *DeWater v. State*, 130

17 Wash. 2d 128, 135 (1996).

18      As to the first element, the conduct complained of "must be unwelcome in the sense

19 that the employee did not solicit or incite it, and in the further sense that the employee

20 regarded the conduct as undesirable or offensive."  *Glasgow v. Georgia-Pacific Corp.*, 103

21 Wash. 2d 401, 406, 693 P.2d 708 (1985).  Whether conduct is unwelcome or offensive

22 generally cannot be determined as a matter of law.  *See, e.g., Davis*, 166 P.3d at 811 (finding

23 that reasonable minds could find that calling an African-American male a "bitch" could

24 potentially have racial undertones as understood by the plaintiff).

25      With respect to the second element, the central inquiry is whether the plaintiff would

26 have been treated differently had she been a different race.  *Colville v. Corbarc Services, Inc.*,

27 73 Wn. App. 433, 438, 869 P.2d 1103 (1994).  "This statutory criterion *requires* that *the*

28 *[race] of the plaintiff-employee be the motivating factor* for the unlawful discrimination."  *Id.*

1   (emphasis in original); *Glasgow*, 103 Wash. 2d at 406.

2       The third element requires that conduct must affect the terms and conditions of a

3   plaintiff's employment.  Specifically, "the harassment must be sufficiently pervasive so as to

4   alter the conditions of employment and create an abusive working environment."  *Glasgow*,

5   103. Wash. 2d at 406.  "Casual, isolated or trivial manifestations of a discriminatory

6   environment do not affect the terms or conditions of employment to a sufficiently significant

7   degree to violate the law."  *Id.*  Whether the harassment is sufficiently severe is determined

8   with regard to the totality of the circumstances.  *Id.* at 406-07; *Adams v. Able Bldg. Supply,*

9   *Inc.*, 114 Wash. App. 291, 296, 57 P.3d 280 (2002).  Washington courts are clear in holding

10  that "[t]he conduct must be both objectively abusive and subjectively perceived as abusive by

11  the victim."  *Clarke v. State Attorney General's Office*, 133 Wn. App. 767, 787, 138 P.3d

12  144 (2006) (*citing Adams*, 114 Wn. App. at 297).

13      Lastly, and as to the fourth element, where a direct agent of the defendant personally

14  participates in the harassment, this element is met by such proof.  *Glasgow*, 103 Wash. 2d at

15  407.  But to hold an employer responsible for the discriminatory work environment, a plaintiff

16  must show that the defendant knew or should have known of the comments and conduct in

17  question and failed to take reasonable corrective action to end the harassment.  *Id.*; *Davis*,

18  166 P.3d at 812; *Francom v. Costco Wholesale Corp.*, 98 Wash. App. 845, 853-54, 991 P.2d

19  1182 (2000).  "This may be shown by proving (a) that complaints were made to the employer

20  through higher managerial or supervisory personnel or by proving such a pervasiveness of

21  [racial] harassment at the work place as to create an inference of the employer's knowledge or

22  constructive knowledge of it[,] and (b) that the employer's remedial action was not of such

23  nature as to have been reasonably calculated to end the harassment."  *Glasgow*, 103 Wash. 2d

24  at 407.

25      It is also well-established that a plaintiff must establish *specific and material facts* to

26  support each element of a prima facie case.  *Marquis v. City of Spokane*, 130 Wash. 2d 97,

27  105, 922 P.2d 43 (1996) (emphasis added); *see also Grimwood v. Univ. of Puget Sound, Inc.*,

28  110 Wash. 2d 355, 360, 753 P.2d 517 (1988) ("[a]n employee must further establish more

MEMORANDUM ORDER
PAGE - 14

1   than an express opinion or make conclusory statements").  Mere dissatisfaction with an

2   employer's response is not evidence that the response was unreasonable.  *See Francom*, 98

3   Wash. App. At 857.  An employer is only required to take whatever action necessary to

4   reasonably prevent future harassment.  *Id.*

5          In the instant case, notwithstanding whether Ms. Coleman has met the first three

6   elements of a hostile environment claim, the fourth element is dispositive.  Ms. Coleman

7   cannot impute responsibility upon Lakeside because Ms. Coleman has failed to show that

8   Lakeside did not take remedial action.  In fact, the evidence shows that once Lakeside became

9   aware that Ms. Coleman had concerns about racism at Lakeside, Lakeside took steps to

10  remedy the situation and address Ms. Coleman's concerns.  For example, after Ms. Coleman

11  reported to Mr. Healy that Student A had allegedly made racist gestures towards her, Mr.

12  Healy met with Student A's parents, and ultimately removed Student A from Ms. Coleman's

13  class.  In addition, Lakeside assigned Ms. Coleman a new mentor, regularly checked up with

14  Ms. Coleman to allow her to address her concerns, and had Mr. Healy and Ms. Sanders sit in

15  on Ms. Coleman's classes.  Lakeside also invited Ms. Coleman to participate in a diversity

16  committee, set up a meeting on January 3, 2006 wherein Mr. Noe invited Ms. Coleman to

17  attend and address issues regarding race and class at Lakeside, and financially supported Ms.

18  Coleman's attendance at a minority conference in Hawaii.  In addition, after the second

19  incident in which Student F made an allegedly racist remark in class, Mr. Healy again

20  conducted an investigation by meeting with Student F.

21         Despite these steps taken by Lakeside, Ms. Coleman indicates that she "repeatedly

22  raised complaints of disparate treatment and racially hostile work environment, without avail"

23  and that Lakeside "did *not* initiate any investigation involving the pervasive racial bias and

24  animus on campus." (Dkt. #248 at 11-12) (emphasis in original).  Ms. Coleman further

25  argues that Lakeside's attempts to resolve her issues were ineffective.  To support her claim,

26  she relies on her own deposition testimony, and the depositions and declarations of other

27  faculty and administrative members to allege that a general and pervasive culture of racism

28  existed at Lakeside.

MEMORANDUM ORDER
PAGE - 15

1    However, the evidence offered by Ms. Coleman only establishes a subjective belief that

2    racism existed and that Lakeside failed to remedy the situation.  For example, Erik Gearhart

3    ("Mr. Gearhart"), a former Middle School teacher at Lakeside, states that he was terminated

4    from Lakeside due to retaliation.  (Dkt. #233, ¶ 6).  Mr. Gearhart's declaration is clearly

5    offered to show that a pervasive culture of racism existed at Lakeside.  But Mr. Gearhart

6    cannot offer any objective evidence to support this claim.[10]

7        Ms. Coleman also offers the declaration of Catherine Pagano ("Ms. Pagano"), a

8    counselor at Lakeside.  (Dkt. #235).  Ms. Pagano states that "I believe [Ms. Coleman was]

9    discriminated against because the school is ill equipped to embrace the customs and ways of

10   people who are culturally different from dominant white America." (*Id.* at 3).  Again, this

11   testimony only adds credence to a subjective belief that racism existed at Lakeside.

12   Furthermore, Ms. Pagano's declaration actually supports the notion that Lakeside was taking

13   reasonable steps to not only resolve Ms. Coleman's concerns, but to address the general belief

14   that a pervasive culture of racism existed at Lakeside.  Ms. Pagano's declaration provides:

15       In January 2006, I began a biweekly "Conversations about Race" for any interested
         faculty and staff at Lakeside to meet and support one another in our efforts to address
16       racism.  I received support to do this from my direct supervisor, [Ms. Christensen], as
         well as Anne Stavney who was then in charge of professional development.  *I*
17       *appreciate their willingness to allow us to talk about race in a sanctioned setting.*

18   (*Id.* at 4) (emphasis added).

19       Rachel Finn ("Ms. Finn"), a former Service Learning Coordinator at Lakeside, also

20   offers a declaration in support of Ms. Coleman.  (Dkt. #241).  Ms. Finn states that "I

21   personally felt that I was treated differently at Lakeside because of my race," and that "I

22   tendered my resignation" and "[o]ne of the reasons I cited was racial discrimination." (*Id.* at

23   13, 15).  But similar to the declarations of Mr. Gearhart and Ms. Pagano, Ms. Finn presents

24

25       [10] Notably, Mr. Gearhart characterizes an email he received from Mr. Noe wherein Mr. Noe

26   responded to Mr. Gearhart's concerns that another teacher was being discriminated against because of her
     race as a "strongly worded reprimand that dismissed my concerns."  (Dkt. #233, Decl. of Gearhart, ¶ 4).

27   However, there is nothing in the language of Mr. Noe's letter that suggests Mr. Noe was not offering
     support for the teacher who allegedly was being discriminated against.  (*Id.*, Ex. 2).

28

MEMORANDUM ORDER
PAGE - 16

no specific objective examples of racial animus directed towards Ms. Coleman.  Moreover, the remaining declarations that Ms. Coleman offers in support of her responsive brief are all beset by similar issues.  Subjective allegations alone do not establish a hostile environment claim for purposes of the WLAD.

In contrast, the objective evidence before the Court shows that Lakeside was addressing issues regarding race and diversity not only while Ms. Coleman was employed at Lakeside as previously discussed, but also before she even arrived.  For example, minutes from several meetings at Lakeside in 2004 establish that directors at Lakeside made it their goal to make diversity an important mission.  (Dkt. #246, Exs. 12-17).  Minutes from a March 30, 2004, meeting provide in pertinent part:

> How are we defining diversity, in the context of the mission focus?  A question that we need to get better at answering is how much [of] this is about race? . . . We want the school to look like the world, not just a narrow slice of it[.] . . . Questions to think about:  How do we define diversity?  Why is valuing diversity important for the school?  How can we help members of the school understand the assumptions that may inhibit acceptance of the need for cultural diversity?

(*Id.*, Ex. 12).

The meetings also establish that the directors at Lakeside were making a concerted effort to relay these issues and concerns to faculty and students.  (*Id.*, Ex. 13 at ¶¶ 4, 5).  And during a faculty meeting shortly thereafter, the minutes affirmatively show that issues regarding diversity were discussed.  (*Id.*, Ex. 16).

Thus, based on the record before it, the Court is compelled to reach the conclusion that Lakeside's response was "reasonably calculated to end the [alleged] harassment."  *See Glasgow*, 103 Wn. 2d at 407.  Culpability can be imputed to an employer where it fails to take immediate and corrective action.  This is simply not the case here based on the *objective* evidence before the Court.  While the Court is sensitive to the fact that Ms. Coleman was experiencing frustration and anxiety at Lakeside, there simply does not exist a sufficient legal nexus between her personal struggles as a teacher and the conduct of Lakeside to impute responsibility upon Lakeside.  It is indisputable that Lakeside took steps to resolve Ms. Coleman's concerns about race.  Whether Ms. Coleman or other faculty and administrative

MEMORANDUM ORDER
PAGE - 17

1  members at Lakeside subjectively believed such steps were ineffective is insufficient to survive

2  summary judgment.  As a result, the Court finds that Ms. Coleman has failed to show a

3  cognizable hostile environment claim under the WLAD.

### 2. Disparate Treatment Claim

5          To establish a prima facie case of disparate treatment under the WLAD, an employee

6  must show that: (1) she belongs to a protected class; (2) she was treated less favorably in the

7  terms or conditions of her employment than a similarly situated, nonprotected employee, and

8  (3) she and the nonprotected comparator were doing substantially the same work.

9  *Washington v. Boeing Co.*, 105 Wash. App. 1, 13, 19 P.3d 1041 (2000) (*quoting Johnson v.*

10  *Dep't of Soc. & Health Servs.*, 80 Wash. App. 212, 227, 907 P.2d 1223 (1996)).  Generally,

11  Washington had adopted the burden-shifting approach articulated in *McDonnell Douglas*

12  *Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973), in analyzing disparate treatment claims

13  under the WLAD.  *See Hill v. BCTI Income Fund-I*, 144 Wash. 2d 172, 180, 23 P.3d 440

14  (2001); *Johnson v. Express Rent & Own, Inc.*, 113 Wash. App. 858, 860, n.2d, 56 P.3d 567

15  (2002).  Under this framework, once an employee has established that she can make out a

16  prima facie case for disparate treatment, the burden shifts to the employer to articulate a

17  legitimate, nondiscriminatory reason for the way the employee was treated.  *Johnson v. Dep't*

18  *of Soc. & Health Servs.*, 80 Wash. App. At 227.  If an employer articulates such a reason, the

19  burden shifts back to the employee to demonstrate pretext by specifically submitting evidence

20  that a non-minority comparator was not disciplined to the same degree as the minority.  *Id.*

21          In this case, there is no dispute that Ms. Coleman, as an African-American, is a

22  member of a protected class.  However, with respect to the second element, Ms. Coleman has

23  failed to present any objective evidence that she was treated less favorably than other

24  employees of Lakeside.  Ms. Coleman, in her responsive brief, alleges that the following facts

25  show that she was treated less favorably than other employees of Lakeside.  First, Ms.

26  Coleman alleges that parents complained of Ms. Coleman's teaching style despite the fact that

27  other white faculty were employing the same methodology and pedagogy.  (Dkt. #248 at   5).

28  Second, Ms. Coleman alleges that no complaints were made against another Asian-American

MEMORANDUM ORDER

PAGE - 18

teacher who employed the same methodology and pedagogy as Ms. Coleman.  (*Id.*).  Third, Ms. Coleman alleges that Mr. Noe allegedly failed to protect Ms. Coleman during a meeting when she felt unsafe but physically protected a white staff person, Ms. Sanders.  (*Id.* at 7).  Fourth, Ms. Coleman alleges that Ms. Sanders twice perpetuated a negative racial stereotype by using incorrect names to address Ms. Coleman and Ms. Finn,  another African-American, and never apologized for the mistake.  (*Id.*).  Lastly, Ms. Coleman alleges that a white faculty member failed to apologize to her when the faculty member manipulated her son's grade in Ms. Coleman's class.  (*Id.* at 8).

In viewing these incidents in the light most favorable to Ms. Coleman, the Court is cannot find that Ms. Coleman has been treated any differently than other similarly situated employees.  With respect to Ms. Coleman's claim that white faculty employed the same methodology and pedagogy as Ms. Coleman but did not receive similar complaints, the Court finds that the evidence suggests otherwise.  For example, Ms. Coleman cites to the deposition of Jamie Asaka ("Ms. Asaka") to support this proposition.  But Ms. Asaka clearly testifies that only Mr. Ogawa employed the same methodology as Ms. Coleman, and that no other white faculty member employed a similar style.  Ms. Asaka's deposition provides:

> Q:    Other than Scott Ogawa, do you know of anybody else at Lakeside in the
>       upper school math department who uses that technique of teaching or anything
>       close to that?
> A:    No.

(Dkt. #246, Ex. A, Dep. of Asaka, 128:14-18).

Nevertheless, as Ms. Coleman herself submits, "an administrator opines Coleman's methodology is excellent."  (Dkt. #248 at 5).  Therefore while parents may have complained of Ms. Coleman's teaching style, Lakeside did not ask Ms. Coleman to change her teaching style.  The evidence shows that Mr. Healy and Ms. Kramer, Ms. Coleman's newly appointed mentor, met with Ms. Coleman but neither counseled Ms. Coleman to change her approach. (Dkt. #209, Decl. of Kramer, ¶ 8; Dkt. #208, Decl. of Healy, ¶ 12).  Additionally, Ms. Coleman was not the only teacher receiving complaints from upset parents.  Annie Garrison, a white female teacher, also received calls from upset parents during the same time as Ms.

1    Coleman did.  (Dkt. #210, Decl. of Garrison, ¶¶ 6, 8).

2         Also, Ms. Coleman suggests that the lack of complaints made against Mr. Ogawa

3    shows that Lakeside engaged in discriminatory practices because both she and Mr. Ogawa

4    employed the same teaching style.  However, the fact that no complaints were made against

5    Mr. Ogawa has no relevance for purposes of Ms. Coleman's disparate treatment claim.

6    Disparate treatment exists where an employee is treated differently than "a similarly situated,

7    nonprotected employee."  *Washington*, 105 Wash. App. at 13.  Mr. Ogawa is a person of

8    color (Dkt. #246, Ex. D, Dep. of Coleman, 36:1-6), not a similarly situated, nonprotected

9    employee.

10        With respect to Ms. Coleman's claim that Mr. Noe failed to protect Ms. Coleman

11   during a meeting even though she felt unsafe, Ms. Coleman contends that she was stunned and

12   overwhelmed that she was never asked how this incident made her feel.  (Dkt. #232, ¶ 49).

13   However, not only does Ms. Coleman fail to present any evidence that she was in fact unsafe,

14   she cannot establish that Mr. Noe had a duty to protect her during the meeting.  Nor can she

15   show that Mr. Noe had a duty to ask her how she felt about the incident.  In any event, the

16   evidence does not indicate that Ms. Coleman raised this issue to Mr. Noe, thereby rendering it

17   impossible for Lakeside to treat Ms. Coleman any different from a similarly situated,

18   nonprotected employee during or following this meeting.

19        In regards to Ms. Coleman's claim that Ms. Sanders never apologized following a

20   statement which Ms. Coleman believed perpetuated a negative racial stereotype, the evidence

21   actually indicates to the contrary.  In an email sent to Ms. Finn and Ms. Coleman on January

22   12, 2006, Ms. Sanders indicates that "I absolutely know who you and Novella are and do not

23   confuse you . . . I'm sorry if you or Novella thought that I didn't know who you were . . . I

24   know that we were all emotional during the meeting, but I hope that misunderstandings like

25   this don't exacerbate the existing problems."  (Dkt. #256, Decl. of Sanders, Ex. A).

26   Therefore, Ms. Coleman's characterization of the evidence is incorrect.

27        Lastly, with respect to Ms. Coleman's claim that a white faculty member failed to

28   apologize to her for manipulating her son's grade, the Court cannot find evidence of such an

MEMORANDUM ORDER

**PAGE - 20**

1    event.  Ms. Coleman cites her deposition testimony at pages 134 through 137, and 176 though

2    183 to support this claim.  (Dkt. #248 at 8).  However, while a review of those pages

3    indicates that Ms. Coleman spoke to Mr. Noe regarding remarks made by a parent (Dkt.

4    #246, Dep. of Coleman, 181:25-183-3), there is no indication of a white faculty member

5    manipulating a grade.[11]   Thus, Ms. Coleman again mischaracterizes the evidence and this

6    allegation does not support her position.

7            Ultimately, Ms. Coleman only offers *subjective* evidence to support her claims of

8    racial discrimination.  The law requires more than a subjective belief, and based upon the

9    objective evidence before the Court, Ms. Coleman has failed to show that she was treated less

10   favorably than other similarly situated, nonprotected employees.  Ms. Coleman's contention

11   that propounding upon the Court 900-plus pages establishes "myriad genuine issues of

12   material facts" is insufficient to survive summary judgment when such evidence is comprised

13   solely of subjective evidence.  Thus, Ms. Coleman's disparate treatment claim under the

14   WLAD also fails as a matter of law.

15       **F.  Ms. Coleman's Claims under 42 U.S.C. § 1981**

16           In analyzing an employee's § 1981 claim, courts apply "the same legal principles as

17   those applicable in a Title VII disparate treatment case."  *Metoyer v. Chassman*, 504 F.3d

18   919, 930 (9th Cir. 2007) (*quoting Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840,

19   850 (9th Cir. 2004)); *see also Jurardo v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1412 (9th Cir.

20   1987) ("facts sufficient to give rise to a Title VII claim are also sufficient for a section 1981

21   claim").  Furthermore, RCW 49.60 follows the same principles as Title VII.  *See Xieng v.*

22   *Peoples Nat. Bank of Washington*, 120 Wash. 2d 512, 518, 844 P.2d 389 (1993); *see also*

23   *Oliver v. Pacific Northwest Bell Tel. Co.*, 106 Wash. 2d 675, 678, 724 P.2d 1003 (1986)

24   ("RCW 49.60 is patterned after Title [VII] . . . [c]onsequently, decisions interpreting the

25   federal act are persuasive authority for the construction of RCW 49.60").  Therefore the

26

27           [11] In fact, page 176 of Ms. Coleman's deposition is omitted entirely from the documents Ms.
28   Coleman submitted to the Court.  (*See* Dkt. #231 and Dkt. #246).

MEMORANDUM ORDER
PAGE - 21

analysis of whether Ms. Coleman has a cognizable claim under 42 U.S.C. § 1981 is similar to whether Ms. Coleman has a claim under RCW 49.60.  Because the Court has concluded that Ms. Coleman's fails to state a claim under RCW 49.60, it likewise finds that Ms. Coleman has failed to state a claim under 42 U.S.C. § 1981 for the reasons articulated above.

### III.  CONCLUSION

Having reviewed the relevant documents, the declarations and exhibits attached thereto, and the remainder of the record, the Court hereby finds and ORDERS:

(1)  Defendant's Motion for Partial Summary Judgment (Dkt. #202) is GRANTED. Plaintiff Novella Coleman's claims are dismissed in their entirety, with prejudice.  This Order does not dismiss the case as plaintiff Chance Sims' claims remain pending before the Court.

(2)  Defendant's Motion to Strike (Dkt. #260) is GRANTED.

(3)  Plaintiff's Motion to Strike (Dkt. #269) is DENIED.

(4)  The Clerk is directed to forward a copy of this Order to all counsel of record.

DATED this 17th day of January, 2008.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

MEMORANDUM ORDER
PAGE - 22