UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CHANCE SIMS,<br><br>               Plaintiff,<br><br>     v.<br><br>LAKESIDE SCHOOL,<br><br>               Defendant. | CASE NO. C06-1412RSM<br><br>ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

## **I.  INTRODUCTION**

This matter comes before the Court on Defendant's Motion for Summary Judgment. (Dkt. #290).  Defendant Lakeside School ("Lakeside") seeks to dismiss Plaintiff Chance Sims' ("Mr. Sims") remaining claims in their entirety.  Lakeside specifically argues that Mr. Sims does not have a cognizable retaliation or disparate treatment claim under RCW 49.60. Lakeside also argues that Mr. Sims does not have a cognizable retaliation or disparate treatment claim under 42 U.S.C. § 1981.  Mr. Sims responds that he was unfairly punished by Lakeside when he was placed on probation after he engaged in a protected activity.  Mr. Sims also indicates that he was treated less favorably than a similarly situated white faculty member. Mr. Sims therefore argues that he has cognizable discrimination claims under both Washington and federal law.

    For the reasons set forth below, the Court agrees with Plaintiff, and DENIES Defendant's Motion for Summary Judgment.

MEMORANDUM ORDER
PAGE - 1

## II. DISCUSSION

### A. Background

The instant civil action arises out of an allegedly racist environment created by Lakeside while Mr. Sims and fellow co-plaintiff Novella Coleman ("Ms. Coleman") were employed at Lakeside as teachers. Mr. Sims and Ms. Coleman brought claims for disparate treatment and hostile work environment under RCW 49.60, also known as the Washington Law Against Discrimination ("WLAD"). Additionally, both plaintiffs brought disparate treatment and hostile work environment claims under 42 U.S.C. § 1981. Mr. Sims also brought a claim for retaliation under the WLAD and 42 U.S.C. § 1981.

As both parties are aware, Lakeside recently moved for partial summary judgment on Ms. Coleman's claims. The Court granted Lakeside's motion and dismissed Ms. Coleman's claims in their entirety on January 17, 2008. (Dkt. #275). Mr. Sims also withdrew his hostile work environment claim on April 25, 2008. (Dkt. #288).

Furthermore, both parties have adequately and extensively briefed the facts that apply to the instant motion. This Court has also previously discussed the environment at Lakeside in great detail in both its order granting Lakeside's motion for partial summary judgment, and in several other orders this Court has issued in this case. Therefore, the Court finds it unnecessary to repeat all of the facts presented by the parties in their entirety, many of which the Court finds irrelevant to the instant motion. Accordingly, the Court shall incorporate the relevant facts that apply to the Court's analysis in the sections below.

### B. Mr. Sims' Withdrawal of his Hostile Environment Claim

As an initial matter, the Court addresses Lakeside's contention that Mr. Sims improperly withdrew his hostile work environment claim. Specifically, Lakeside contends that Mr. Sims unilaterally withdrew his hostile environment claim, rather than by stipulation of the parties pursuant to Fed. R. Civ. P. 41(a)(1)(A), thereby depriving Lakeside of its ability to seek costs associated with defending against Mr. Sims's hostile environment claim. (Dkt. #290 at 1). Mr. Sims responds that Fed. R. Civ. P. 41 applies only to "actions" rather than claims. (Dkt. #310 at 21). Consequently, Mr. Sims contends that he has followed the proper

1  procedure for withdrawing his claim.

2  Neither party, however, offers any extensive briefing or argument with respect to this
3  issue. In fact, the parties' arguments are confined to footnotes within their briefs. As a result,
4  the Court finds it unnecessary to determine whether Mr. Sims properly withdrew his hostile
5  work environment claim at this time. The only claims the Court shall discuss in this order are
6  Mr. Sims' disparate treatment and retaliation claims brought under the WLAD and 42 U.S.C.
7  § 1981. Nothing in the language of this Order prevents Lakeside from filing a specific motion
8  on this issue.

9  **C. Standard of Review on Summary Judgment**

10 Summary judgment is proper where "the pleadings, depositions, answers to
11 interrogatories, and admissions on file, together with the affidavits, if any, show that there is
12 no genuine issue as to any material fact and that the moving party is entitled to judgment as a
13 matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247
14 (1986). The Court must draw all reasonable inferences in favor of the non-moving party.
15 *See F.D.I.C. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992), *rev'd on other*
16 *grounds,* 512 U.S. 79 (1994). The moving party has the burden of demonstrating the absence
17 of a genuine issue of material fact for trial. *See Anderson*, 477 U.S. at 257. Mere
18 disagreement, or the bald assertion that a genuine issue of material fact exists, no longer
19 precludes the use of summary judgment. *See California Architectural Bldg. Prods., Inc., v.*
20 *Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987).

21 Genuine factual issues are those for which the evidence is such that "a reasonable jury
22 could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248. Material facts
23 are those which might affect the outcome of the suit under governing law. *See id.* In ruling
24 on summary judgment, a court does not weigh evidence to determine the truth of the matter,
25 but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41
26 F.3d 547, 549 (9th Cir. 1994) (citing *O'Melveny & Meyers*, 969 F.2d at 747).

27 In the context of an employment discrimination claim, "[s]ummary judgment in favor
28 of the employer in discrimination cases is often inappropriate because the evidence will

MEMORANDUM ORDER
PAGE - 3

generally contain reasonable but competing inferences of both discrimination and nondiscrimination that must be resolved by a jury[.]" *Kuyper v. State*, 79 Wash.App. 732, 739, 904 P.2d 793 (1995) (internal quotation omitted). However, this does not mean that "discrimination cases may never be disposed of on summary judgment." *Id*. Summary judgment is proper if a plaintiff produces no evidence that an employer's decision was motivated by an intent to discriminate. *Id.* A plaintiff "must do more than express an opinion or make conclusory statements." *Marquis v. City of Spokane*, 130 Wash.2d 97, 105, 922 P.2d 43 (1996) (citation omitted). "The worker must establish *specific and material facts* to support each element of his or her prima facie case." *Id.* (citation omitted) (emphasis added). A question of fact can be determined as a matter of law "only where reasonable minds could reach but one conclusion." *Davis v. West One Automotive Group*, 140 Wash.App. 449, 166 P.3d 807, 811 (2007) (citation omitted).

### D.  Mr. Sims' Retaliation Claim

In analyzing retaliation claims under the WLAD, Washington case law has adopted the burden-shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973). *See Hill v. BCTI Income Fund-I*, 144 Wash.2d 172, 180, 23 P.3d 440 (2001); *Renz v. Spokane Eye Clinic, P.S.*, 114 Wash.App. 611, 618, 60 P.3d 106 (2002). Under this approach, the plaintiff bears the initial burden of setting forth a prima facie case of unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 802. If a prima facie case is established by the plaintiff, a "legally mandatory, rebuttable presumption" of discrimination temporarily takes hold. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, n.7, 101 S.Ct. 1089 (1981). The evidentiary burden then shifts to the defendant to produce admissible evidence of a legitimate, nondiscriminatory explanation for the adverse employment action sufficient to "raise [] a genuine issue of fact as to whether [the defendant] discriminated against the plaintiff." *Hill*, 144 Wash.2d at 181 (quoting *Burdine*, 450 U.S. at 254-55).

If the defendant fails to meet this burden, the plaintiff is entitled to an order establishing liability as a matter of law. *Kastanis v. Educational Employees Credit Union*, 122 Wash.2d 483, 490, 859 P.2d 26 (1993). If, however, the defendant meets this burden,

1  the burden shifts back to the plaintiff, who must then show "that [defendant's] stated reason
2  [for the adverse action] was in fact pretext." *McDonnell Douglas*, 411 U.S. at 804. The
3  burden of persuading the trier of fact ultimately rests with the plaintiff. *Burdine*, 450 U.S. at
4  253. If the plaintiff cannot meet this burden, the defendant becomes entitled to judgment as a
5  matter of law. *Grimwood v. Univ. of Puget Sound*, 110 Wash.2d 355, 365, 753 P.2d 517
6  (1988). Importantly, the burden on both parties is not one of persuasion, but one of
7  production. *Carle v. McChord Credit Union*, 65 Wash.App. 93, 98-102, 827 P.2d 1070
8  (1992). The burden of production is applied by the judge, whereas the burden of persuasion is
9  applied by the trier of fact. *Id.* (citations omitted).

### 1. Prima Facie Case of Retaliation

To establish a prima facie claim for retaliation under the WLAD, a plaintiff must show that: (1) he engaged in a statutorily protected activity; (2) his employer took some adverse employment action against him; and (3) retaliation was a substantial factor behind the adverse employment action. *Washington v. Boeing Co.*, 105 Wash.App. 1, 13, 19 P.3d 1041 (2000) (citations omitted). Accordingly, the Court examines each element in turn.

<u>a. Protected opposition activity</u>

First, to determine whether an employee engaged in protected opposition activity, the court must balance the setting in which the activity arose and the interests and motives of the employer and employee. *Colville v. Cobarc Servs., Inc.*, 73 Wash.App. 433, 439 (1994) (citations omitted). Opposition to an employer's possible discrimination does not enjoy absolute protection or immunity, because an employee may still be discharged for cause. *Id.* (citations omitted). However, "'an employee who opposes employment practices reasonably believed to be discriminatory is protected by the 'opposition clause' *whether or not the practice is actually discriminatory*.'" *Graves v. Dep't of Game*, 76 Wash.App. 705, 712, 887 P.2d 424 (1994) (quoting *Gifford v. Atchison, Topeka & Santa Fe Ry.*, 685 F.2d 1149, 1157 (9th Cir. 1982) (emphasis added)). In other words, whether a plaintiff's beliefs that his employer's practices are discriminatory are well-founded is not dispositive of his retaliation claim. *See Renz*, 114 Wash.App. at 619. Rather, a plaintiff needs only to demonstrate that his

MEMORANDUM ORDER
PAGE - 5

"belief was reasonable under the circumstances." *Id.*

Here, the protected activity at issue is an email sent out by Mr. Sims to all Lakeside faculty and staff on February 14, 2006, in support of Kim Pollock ("Ms. Pollock").[1]  Ms. Pollock was an African-American teacher who left Lakeside earlier that year.  In the email (the "Valentine" email), Mr. Sims challenged Lakeside's retention efforts of Ms. Pollock, and also offered support for Ms. Pollock's teaching style and personality by using literary references.  Mr. Sims' email provided in pertinent part:

> When thinking about my friend Kim Pollock I am reminded of a passage in James Baldwin's *The Fire Next Time* . . . Baldwin says "Love takes off the masks that we fear we cannot live without and know we cannot live within. I use the word 'love' here not merely in the personal sense but as a state of being, or a state of grace - not in the infantile American sense of being made happy but in the tough and universal sense of quest and daring and growth." It was Baldwin's notion of love that Kim aspired to and for those who were lucky to stand in her company understood. Those of us who were able to look beyond our fears and insecurities found a loving and affectionate woman awaiting our arrival.
>
> [* * *]
>
> Troubled by her disappearance and the character assassination that followed I have spent the last few weeks searching for a way to make sense of the storm that swept my friend and colleague away. I have talked with friends and family, colleagues, and strangers who were willing to listen. In the end I sat with my books searching for a few honest words. In "The Prevention of Literature," Orwell wrote: "To write in plain, vigorous language one has to think fearlessly, and if one thinks fearlessly one cannot be politically orthodox." If Kim's teaching and activism is written off by some as hopelessly impractical, hostile, or vaguely utopian in nature, as it no doubt will, don't be fooled. That's the voice of political orthodoxy. No genius I know of has ever said, "Oh, that's impractical." Brilliant thinkers say, "Let's look at this from a new angle." That, in effect, is what Kim did over the past two years.
>
> [* * *]
>
> Some will say that [Ms. Pollock] was uncompromising, antagonistic, difficult, and selfish but those who knew her know that she was a rare individual with a heart and mind that was unmatched. I have heard administrators say that her departure was inevitable. After learning that the administration is spending hundreds of hours dealing with the D'Souza debacle I'm left to wonder how this school might look if the administration spent hundreds of hours supporting retention efforts. Maybe we could replace probation and other punitive measures with "real" supervision and support?

---

[1] Lakeside also contends that Mr. Sims' conduct during a January 3, 2006 meeting, which is described in further detail below, was not a protected activity. (Dkt. #290 at 18). However, the Court does need to address all potential protected activities. So long as Mr. Sims can identify one protected activity, that is sufficient to meet the first element of his prima facie case of retaliation.

MEMORANDUM ORDER
PAGE - 6

(Decl. of Fury, Ex. D at 51-52).

Lakeside argues that Mr. Sims' email was not a protected activity under the WLAD because no mention of racial discrimination was expressly included in the text of the "Valentine" email. While it is certainly true that there is no direct reference to racial discrimination in the email, the law requires an examination of not only the activity itself, but the circumstances surrounding the alleged protected activity as well. *See Renz*, 114 Wash.App. at 619. Here, there is no question that Mr. Sims' email was sent to Lakeside faculty and staff when there was a heightened sensitivity toward racial issues at the school. The email correspondence between Lakeside administrators, faculty, and staff during this time all support this notion. (*See* Decl. of Fury, Ex. D).

In addition, Mr. Sims' sent the "Valentine" email in support of Ms. Pollock after her separation with Lakeside; a separation which Mr. Sims reasonably believed to be due to the racial tensions between the administration and Ms. Pollock. While Lakeside contends that Ms. Pollock decided to leave Lakeside for health reasons, it is clear that the circumstances leading up to her separation with Lakeside were clouded with racial controversy. (*See* Decl. of Fury, Ex. D at 66-75). And although unknown to Mr. Sims at the time, Ms. Pollock reached a settlement with Lakeside wherein Lakeside agreed to release Ms. Pollock from her teaching duties and pay her a certain specified sum, in exchange for a promise from Ms. Pollock that she would not bring any claims against Lakeside related to her employment. (*Id.*, Ex. C).

Ultimately, the Court agrees with Mr. Sims that protected opposition includes complaints about the treatment of other employees. *See, e.g., Ray v. Henderson*, 217 F.3d 1234, 1240, n.3 (9th Cir. 2000) ("[A]n employee's complaints about the treatment of others is considered a protected activity, *even if* the employee is not a member of the class that he claims suffered from discrimination, and *even if* the discrimination he complained about was not legally cognizable") (emphasis added). Whether Lakeside's conduct toward Ms. Pollock actually rose to the level of racial discrimination is not dispositive. Thus, the Court finds that

MEMORANDUM ORDER
PAGE - 7

1  Mr. Sims' conduct of sending out a "Valentine" email to all Lakeside faculty and staff in
2  support of Ms. Pollock was a statutorily protected activity for purposes of the WLAD.

### b.  Adverse Employment Action

4  The next element requires the Court to analyze whether the employer took an adverse
5  employment action against the employee. *See Boeing*, 105 Wash.App. at 13.  The Supreme
6  Court has held that an adverse employment action exits if it is materially adverse to a
7  reasonable employee or job applicant. *Burlington Northern & Sante Fe Ry. Co. v. White*, 548
8  U.S. 53, 126 S.Ct. 2405, 2409 (2006).  In other words, the employer's conduct in response to
9  a plaintiff's protected activity "must be harmful to the point that they could well dissuade a
10 reasonable worker from making or supporting a charge" of unlawful conduct by the employer.
11 *Id.*  The Ninth Circuit has similarly held that an "action is cognizable as an adverse
12 employment action if it is reasonably likely to deter employees from engaging in protected
13 activity." *Ray*, 217 F.3d at 1243.  Notably, Washington courts have found adverse
14 employment actions in a variety of circumstances. *See*, *e.g.*, *Davis v. Dep't of Labor &
15 Indus.*, 94 Wash.2d 119, 615 P.2d 1279 (1980) (failure to promote is an actionable adverse
16 employment action); *Kirby v. City of Tacoma*, 124 Wash.App. 454, 98 P.3d 827 (2004)
17 (reducing pay constitutes adverse employment action); *Torres v. Washington State Liquor
18 Control Bd.*, 2007 WL 1674418, *2 (Wash.App. Div. 2, June 12, 2007) (suspension without
19 pay is an adverse employment action); *see also Robel v. Roundup Corp.*, 148 Wash.2d 35,
20 74, n.15, 59 P.3d 611 (2002) (noting that a demotion or adverse transfer constitutes an
21 adverse employment action).

22 In the instant case, Mr. Sims was placed on probation for approximately two months
23 on February 27, 2006.  (Decl. of Fury, Ex. E at 96).  Lakeside contends that this was not an
24 adverse employment action because Mr. Sims received no reduction in pay, and because his
25 work assignment and schedules were not impacted by his probationary status.  (Dkt. #290 at
26 20).  However, this argument ignores the fact that Mr. Sims suffered a material change in the
27 conditions of his employment: he was precluded from his ability to teach for two months. *See
28 generally Weisman v. New York City Dep't of Educ.*, 2005 WL 1813030, *8 (S.D.N.Y. 2005)

MEMORANDUM ORDER
PAGE - 8

1  (noting that in the context of an employment discrimination claim brought by a teacher, a
2  decrease in pay or probation constitutes an adverse employment action).  Certainly, a
3  reasonable employee would consider probation to be materially adverse, irrespective of
4  whether he continued to receive salary.  *See Burlington*, 126 S.Ct. at 2415.  Indeed, as Mr.
5  Sims points out, probation is considered a serious measure at Lakeside.  For example, the
6  deposition of Bernie Noe ("Mr. Noe"), Head of School at Lakeside, provides:

> Q: Is - as head of school, is putting someone on probation a serious act or a serious measure?
>
> A: It is.
>
> Q: Why is it serious?
>
> A: Because it can mean that you don't - if you don't fulfill the terms of probation and don't come off probation, you could theoretically not work at the school.

(Decl. of Fury, Ex. F at 644).

Moreover, a two-month probation in response to a protected activity is certainly an action that is "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge" of unlawful conduct by an employer.  *Burlington*, 126 S.Ct. at 2409.  A reasonable employee could very well be deterred from engaging in the type of activity that Mr. Sims engaged in if he or she knew that probation was a potential response by Lakeside.  As a result, the Court finds that Mr. Sims has provided sufficient evidence to establish that he suffered an adverse employment action.

### c.  Retaliation must be a substantial factor

Lastly, the plaintiff must show that retaliation was a substantial factor behind the adverse employment action.  *See Boeing*, 105 Wash.App. at 13; *see also Francom v. Costco Wholesale Corp.*, 98 Wash.App. 845, 862, 991 P.2d 1182 (2000) ("The plaintiff need not show that retaliation was the only or 'but for' cause of the adverse employment action, but he or she must establish that it was at least a substantial factor.") (citation omitted).  "A factor supporting the decision is 'substantial' if it so much as tips the scales one way or the other." *Renz*, 114 Wash.App. At 621.  A plaintiff can establish that the employer acted with an improper motive if there is "[p]roximity in time between the adverse action and the protected

MEMORANDUM ORDER
PAGE - 9

activity, coupled with evidence of satisfactory work performance and supervisory evaluations[.]" *Kahn v. Salerno*, 90 Wash.App. 110, 131-32, 951 P.2d 321 (1998) (quoting *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wash.2d 46, 69, 821 P.2d 18 (1991)).

Here, there can be little doubt that there exists a sufficient temporal proximity between Mr. Sims protected activity and Lakeside's response. Mr. Sims sent out the "Valentine" email on February 14, 2006, and Lakeside administrators subsequently met with Mr. Sims and notified him of his probation three days later in a face-to-face meeting. Lakeside officially notified Mr. Sims of his probation via letter on February 27, 2006. In addition, there is no question that Mr. Sims has provided evidence to the Court that he received satisfactory work performance and supervisory evaluations. For example, Than Healy ("Mr. Healy"), Head of the Upper School, and David Beare ("Mr. Beare"), the History Department chair, wrote an evaluation for Mr. Sims which stated that "Chance, you are a highly aware, reflective teacher who has the range and flexibility to work with a verity of groups and learners at a very high level . . . we consider you a model teacher." (Decl. of Fury, Ex. E at 120). Thus, given the rule of law established by *Kahn*, Mr. Sims has made the requisite showing that Lakeside may have acted with a retaliatory motive when placing him on probation.

Overall, the Court finds that Mr. Sims has met his initial burden of showing that a prima facie case for retaliation exists under the WLAD. As such, the Court turns to whether Lakeside has shown that it had legitimate reasons for placing Mr. Sims on probation.

### 2. Lakeside's Legitimate and Nondiscriminatory Explanations

To satisfy the burden of production after a plaintiff presents a prima facie case, "the employer must articulate a legitimate nonpretextual nonretaliatory reason for the discharge." *Wilmot*, 118 Wash.2d at 70 (citation omitted). "The employer must produce relevant admissible evidence of another motivation, but need not do so by the preponderance of evidence necessary to sustain the burden of persuasion, because the employer does not have that burden." *Id.* (citing *Baldwin v. Sisters of Providence in Washington, Inc.*, 112 Wash.2d 127, 136, 769 P.2d 298 (1989)). Again, the burden is not one of persuasion, but rather production. *See Carle*, 65 Wash.App. at 98-102.

MEMORANDUM ORDER
PAGE - 10

Here, Lakeside offers evidence that Mr. Sims was sent a probation letter on February 27, 2006. The letter, written by Mr. Noe, indicates that Mr. Sims was placed on probation specifically because (1) Mr. Sims inappropriately questioned the integrity of Lakeside administration through the "Valentine" email, and (2) Mr. Sims' acted improperly at a previous faculty meeting. The letter provides:

> I am writing to follow up on the meeting that we had in my office on February 17, 2006 . . . As we all said in the meeting, Chance, no one has a problem with the points you raise or the messages you promote at Lakeside, but rather with the way in which you raise them. It is at a point where your method of delivery is unacceptable: it undermines the sense of community we are trying to build at the school. Specifically, sending out an e-mail to 190 people essentially questioning the integrity of Upper School Director Than Healy is unacceptable, as is swearing at a faculty meeting and taking on a colleague in a very personal and hurtful manner. Neither method serves the message you want us all to hear, and both methods undermine the trust and collegiality necessary to do the difficult work with diversity and other issues that we have ahead.

(Decl. of Fury, Ex. E at 96).

Lakeside offers additional evidence that Mr. Sims' conduct at the faculty meeting referenced in the probation letter was inappropriate. According to Mr. Healy, this meeting, which took place on January 3, 2006, was held "to talk about retention of faculty specifically . . . [and] it was to be a meeting where people could share what they wanted." (Decl. of Fury, Ex. F at 613). The meeting was also apparently held in response to the controversial invitation of Dinesh D'Souza ("Mr. D'Souza") to speak at Lakeside. Mr. Sims took offense to the invitation, and made his opinions known to all those in attendance at the meeting. Lakeside indicates that Mr. Sims confronted Lisa Sanders ("Ms. Sanders"), an administrator who played a central role in the invitation of Mr. D'Souza. (Dkt. #290 at 3). During this confrontation, Mr. Sims suggested that she was ignorant and should be embarrassed for extending an invitation to such a controversial and conservative commentator. (*Id.*). Mr. Sims also repeatedly used expletives throughout the meeting. (Dkt. #299, Decl. of Walton at 65). The meeting was eventually adjourned by Mr. Noe due to the rising hostility. As a result, Lakeside claims that Mr. Sims' behavior at this meeting was an additional ground for Mr. Sims' probation.

Based on this evidence, coupled with the reference to the "Valentine" email in Mr.

MEMORANDUM ORDER
PAGE - 11

1  Sims' probation letter, the Court finds that Lakeside has articulated a legitimate and
2  nondiscriminatory reason for placing Mr. Sims on probation. Lakeside has clearly
3  "produce[d] relevant admissible evidence of another motivation" other than racial animus.
4  *See Wilmot*, 118 Wash.2d at 70. It is certainly reasonable for Lakeside to place a faculty
5  member or employee on probation for inappropriate and disruptive conduct. The Court is
6  satisfied that Lakeside has sufficiently met its minimal burden of production. *See Carle*, 65
7  Wash.App. at 98-102.

### 3. Pretext

If the employer produces evidence of a legitimate basis for the adverse employment action, the burden shifts back to the plaintiff to offer evidence that the employment's articulated reason is pretextual. *See Wilmot*, 118 Wash.2d at 73. A "plaintiff can prove pretext either (1) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is *internally inconsistent* or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Lyons v. England*, 307 F.3d 1092, 1113 (9th Cir. 2002) (internal quotations omitted) (emphasis added); *Carle*, 65 Wash.App. at 102. "While the plaintiff always retains the burden of persuasion, he does not necessarily have to 'introduce additional, independent evidence of discrimination.'" *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000) (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149, 120 S.Ct. 2097 (2000)); *see also Lyons*, 307 F.3d at 1112 ("[T]his final burden shift does not necessarily impose a new burden of production"). Courts should look to the cumulative evidence, and therefore consider indirect with direct evidence to the extent that both are available. *Id.* (citation omitted). If there is "any indication of discriminatory motive[,] summary judgment for the defendant will ordinarily not be appropriate on any ground[.]" *Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir. 1995).

In the instant case, Mr. Sims has met his ultimate burden because Mr. Sims has offered evidence that Lakeside's proffered reasons for placing him on probation are both inconsistent and arguably contradictory. For example, the February 27, 2006 probation letter notifies Mr.

MEMORANDUM ORDER
PAGE - 12

Sims that he was being placed on probation for not only his "Valentine" email, but also his conduct of "swearing at a faculty meeting and taking on a colleague in a very personal and hurtful manner." (Decl. of Fury, Ex. E at 96). However, on June 5, 2006, Mr. Noe wrote a subsequent letter to Mr. Sims indicating that the only reason Mr. Sims was placed on probation was for his conduct in sending out the "Valentine" email to all faculty and staff at Lakeside. Specifically, the letter provides:

> With regard to the second point you raise in your May 25 letter about my including a number of events in your February probation letter that I did not mention in the February probation meeting, I can only state that I did not use the February meeting to review every single incident *but rather focused on the incident that prompted your being placed on probation. I do understand your point that that did not leave you a chance to respond to those specific points. I will take those points out of the February letter and we will move on.* I see no value, at this juncture, in revisiting those points.

(Decl. of Fury, Ex. E at 101) (emphasis added).

And to the extent that there is any confusion regarding the meaning or context of this letter, Mr. Noe clarifies the uncertainty in his deposition. Mr. Noe's deposition provides:

> Q: And the incident that led to [Mr. Sims'] probation is the email of February [14], 2006, entitled, a Valentine for Kim Pollock, right . . . ?
>
> A: It's the incident that prompted his being placed on probation.

(*Id.*, Ex. F at 646).

The President of Lakeside's Board of Trustees, Libby Armintrout ("Ms. Armintrout"), agrees. Ms. Armintrout's deposition provides:

> Q: . . . I'm asking you to read the letter and tell me what you understand by it as to what points are being taken out of the February letter, based upon what the letter communicates to you.
>
> * * *
>
> A: I guess it's my personal understanding that he is suggesting that it was the incident of the e-mail that prompted the probation.

(*Id.*, Ex. F at 476).

Furthermore, Lakeside now argues in its summary judgment motion that it was not only the "Valentine" email that prompted Mr. Sims' probation, but Mr. Sims' continual destructive conduct despite repeated counseling. (Dkt. #290 at 23). As both parties have

MEMORANDUM ORDER
PAGE - 13

1  indicated, Mr. Sims' employment at Lakeside has been tenuous, and he has had several
2  interactions with Lakeside administration regarding the controversial nature in which he
3  communicated with the Lakeside community.  Lakeside specifically contends that Mr. Sims
4  had been "counseled at least three times regarding the tone and method of his communications
5  with his colleagues."  (Dkt. #315 at 10).  Moreover, Lakeside urges the Court to consider Mr.
6  Sims' entire employment history in evaluating whether Mr. Sims can show pretext.  In support
7  of its argument, Lakeside cites case law that suggests that an employee's prior misconduct is
8  always considered when determining whether to take action with regard to an employee's
9  latest instance of misconduct.  *See Strong v. Univ. Healthcare Sys.*, 482 F.3d 802 (5th Cir.
10 2007); *Passarge v. Sharefax Credit Union*, 277 F.Supp.2d 819 (S.D.Ohio 2003); (Dkt. #315
11 at 12).

12       Generally speaking, the Court agrees that an employer's action cannot be viewed in a
13 vacuum.  The Court also acknowledges that Lakeside has provided evidence that Mr. Sims
14 had been counseled several times at Lakeside prior to his probation on February 17, 2006.
15 Nevertheless, the appropriate inquiry at this stage is whether Mr. Sims, at the very minimum,
16 can establish pretext; a burden he can meet through indirect evidence that suggests an
17 employer is offering inconsistent or contradictory reasons for its adverse employment action.
18 It is clear that Mr. Sims has made this showing.  Not only does the objective evidence show
19 that the internal correspondence at Lakeside provided inconsistent messages to Mr. Sims, but
20 now Lakeside argues during litigation *nunc pro tunc* that all activities must be considered as a
21 whole.  This argument is inconsistent with the reasons cited by Mr. Noe in his probation letter
22 and his follow-up letter.  As Mr. Sims points out in his opposition, this is "litigation reverse
23 engineering" (Dkt. #310 at 30).  Thus, the Court finds that Mr. Sims has met his ultimate
24 burden of establishing that Lakeside's reasons for his probation were pretext.  *See Sellsted v.*
25 *Washington Mut. Sav. Bank*, 69 Wash.App. 852, 861 (1993) ("[T]he fact that there were
26 multiple reasons given for [the plaintiff's adverse employment action] further suggests that
27 none of the reasons given was the real reason, and thus also raises the inference that those
28 reasons are pretextual and unworthy of belief").

MEMORANDUM ORDER
PAGE - 14

Ultimately, if all burdens have been met and there are competing reasonable inferences, both discriminatory and nondiscriminatory, then a jury must decide the question. *Hill*, 144 Wash.2d at 186; *see also Carle*, 65 Wash.App. at 101 ("When all three facets of the burden of production have been met, the case must be submitted to the jury."). Here, both parties have met their respective burdens, and both parties have offered competing inferences based on the objective evidence before the Court. Consequently, the Court finds it inappropriate to grant summary judgment in favor of Lakeside on Mr. Sims' retaliation claim under the WLAD.

### E. Mr. Sims' Disparate Treatment Claim

The same burden-shifting approach established by *McDonnell Douglas* with respect to a retaliation claim brought under the WLAD applies to Mr. Sims' disparate treatment. To establish a prima facie case of disparate treatment under the WLAD, an employee must show that: (1) he belongs to a protected class; (2) he was treated less favorably in the terms or conditions of his employment than a similarly situated, nonprotected employee, and (3) he and the nonprotected comparator were doing substantially the same work. *Boeing*, 105 Wash.App. at 13 (quoting *Johnson v. Dep't of Soc. & Health Servs.*, 80 Wash.App. 212, 227, 907 P.2d 1223 (1996)). In addition, Washington case law also suggests that a court should consider whether a plaintiff has suffered an adverse employment action in analyzing a disparate treatment claim. *See Kirby*, 124 Wash.App. at 468; *Roeber v. Dowty Aerospace*, 116 Wash.App. 127, 135, 64 P.3d 691 (2003).

Notably, Lakeside indicates that Mr. Sims has incorrectly cited to an unpublished Ninth Circuit opinion to establish the disparate treatment test under the WLAD. *See Hernandez v. City of Vancouver*, 2008 WL 1741492 (9th Cir. April 14, 2008). Moreover, Lakeside infers that the Court should not consider whether Mr. Sims suffered an adverse employment action in analyzing his disparate treatment claim. However, the analysis of whether an employee has a retaliatory claim under the WLAD is parallel to whether he has a similar claim under federal law. *See Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 969 (9th Cir. 2002) (citing *Graves*, 76 Wash.App. at 887). Indeed, Lakeside acknowledges that Washington case law looks to interpretations of federal law when construing the WLAD.

MEMORANDUM ORDER
PAGE - 15

1  (Dkt. #290 at 24). Furthermore, the Ninth Circuit clearly establishes that in order for a
2  plaintiff to make a claim for disparate treatment in an employment discrimination claim, he
3  must show that he experienced an adverse employment action. *See Fonseca v. Sysco Food*
4  *Servs. of Ariz., Inc.*, 374 F.3d 840, 847 (9th Cir. 2004); *Peterson v. Hewlett-Packard Co.*,
5  358 F.3d 599, 603 (9th Cir. 2004); *Lyons*, 307 F.3d at 1112. The Court therefore finds that
6  whether an employee suffers an adverse employment action is part of the disparate treatment
7  analysis under the WLAD.

8  In the instant case, there is no dispute by Lakeside that Mr. Sims is a member of a
9  protected class. And as established above, the Court finds that Mr. Sims did indeed suffer an
10 adverse employment action. Lakeside does contend, however, that Mr. Sims cannot identify a
11 similarly situated, nonprotected employee who received more favorable treatment.

12 In determining whether a similarly situated, nonprotected employee exists, "[t]he
13 critical question is whether the plaintiff and the other employee are similarly situated in 'all
14 *material* aspects.'" *Bowden v. Potter*, 308 F.Supp.2d 1108, 1117 (N.D.Cal. 2004) (citing
15 *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001)) (emphasis in original).
16 Importantly, similarly situated does not mean that the employees be *identically* situated.
17 *Bowden*, 308 F.Supp.2d at 1117. This determination will depend on the circumstances and
18 nature of every case, and "[t]he issue of similarly situated status . . . defies a mechanic or
19 formulaic approach. *Id.* Overall, "where a plaintiff seeks to establish the minimal prima facie
20 case by making reference to the disparate treatment of other employees, those employees must
21 have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the
22 difference of treatment may be attributable to discrimination." *McGuinness*, 263 F.3d at 54.

23 Here, Mr. Sims argues that Ms. Rockwell is a similarly situated employee who was
24 given more favorable treatment. Mr. Sims indicates that Ms. Rockwell, who is white, sent out
25 an email that criticized Lakeside's ability to retain faculty of color. Ms. Rockwell's email,
26 which was also sent out to all faculty and staff at Lakeside on December 5, 2005, specifically
27 provides:

28 I am disturbed by the fact that our community is losing some fantastic teachers of

MEMORANDUM ORDER
PAGE - 16

> color at an alarming rate. Private conversations continue to happen and keep us from hearing each others' stories. As a white faculty member, I would like to better understand the subtle and overt racism that we as white folks continue to subscribe to in our Lakeside systems.
>
> I strongly encourage anyone concerned about this issue to attend and be prepared to listen to those willing to tell their story. I hope the conversations shed some light on our community and act as a catalyst for individual chance.
>
> If I am the only one in the room on Wednesday, I fear for our mission focus, our students and our honesty as a school.

(Decl. of Fury, Ex. E at 108).

Mr. Sims further alleges that Ms. Rockwell was not punished for this email, despite the strong allegations contained therein. Mr. Sims also claims that Ms. Rockwell is similarly situated to himself in every material respect, as they are both teachers, and have the same supervisory hierarchy in Mr. Noe and Mr. Healy. Lakeside counters that the two are not similarly situated, because Mr. Sims has presented no evidence to suggest that Ms. Rockwell had either been advised, counseled, or warned in the past as Mr. Sims had.

Nevertheless, given the fact that all inferences must be drawn in favor of the nonmoving party, the Court finds that it is the province of the jury to determine whether Mr. Sims and Ms. Rockwell were similarly situated in all "material aspects." *See Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) ("Ordinarily, the question of whether two employees are similarly situated is a question of fact for the jury."). The objective evidence establishes that Mr. Sims was punished, while Ms. Rockwell was not. And the evidence also shows that Lakeside administrators handled Ms. Rockwell's email in a diplomatic manner, while Mr. Sims was placed on probation immediately following his "Valentine" email.

Additionally, Lakeside notes that another faculty member, Eric Gearhart ("Mr. Gearhart"), is a more appropriate comparator because he had a history of being counseled and warned before he was punished for "insensitivity and rudeness towards colleagues." (Dkt. # 290 at 7); (Dkt. #315 at 13). However, Lakeside offers no case law that suggests that simply because a more appropriate comparator exists, the Court should preclude itself from analyzing all potential similarly situated employees. As a result, the Court finds that Mr. Sims has met

his "minimal burden" of showing that Ms. Rockwell was similarly situated but treated differently. Mr. Sims has therefore established a prima facie case for disparate treatment under the WLAD.

Furthermore, because the same burden-shifting approach established by *McDonnell Douglas* previously analyzed by the Court for Mr. Sims' retaliation claim also applies to Mr. Sims' disparate treatment claim, the Court finds it unnecessary to repeat the analysis here. The Court has found that Mr. Sims has met his ultimate burden of production in showing that Lakeside's reasons for his probation were pretext, and therefore the Court finds it inappropriate to grant summary judgment in favor of Lakeside.

### F. Mr. Sims' 42 U.S.C. § 1981 Claims

As the Court has established, the analysis of a federal discrimination claim parallels the analysis of a WLAD discrimination claim. Specifically, courts apply "the same legal principles as those applicable in a Title VII disparate treatment case" when analyzing an employee's 42 U.S.C. § 1981 claim. *Metoyer v. Chassman*, 504 F.3d 919, 930 (9th Cir. 2007) (*quoting Fonseca*, 374 F.3d at 850); *see also Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1412 (9th Cir. 1987) ("facts sufficient to give rise to a Title VII claim are also sufficient for a section 1981 claim"); *Selberg United Pacific Ins. Co.*, 45 Wash.App. 469, 472 (1986) ("Washington courts look to interpretations of the federal law when construing [claims under the WLAD]"). Furthermore, the WLAD follows the same principles as Title VII claims. *See Xieng v. Peoples Nat. Bank of Washington*, 120 Wash.2d 512, 518, 844 P.2d 389 (1993); *see also Oliver v. Pacific Northwest Bell Tel. Co.*, 106 Wash.2d 675, 678, 724 P.2d 1003 (1986) ("RCW 49.60 [the WLAD] is patterned after Title [VII] . . . [c]onsequently, decisions interpreting the federal act are persuasive authority for the construction of RCW 49.60"). Therefore the analysis of whether Mr. Sims has a cognizable claim under 42 U.S.C. § 1981 is similar to whether Mr. Sims has a claim under the WLAD. Consequently, because the Court has concluded that there exists a genuine issue of material fact with respect to Mr. Sims claims under the WLAD, the Court likewise finds no justification for the dismissal of Mr. Sims' 42 U.S.C. § 1981 claims.

### III.  CONCLUSION

Having reviewed the Defendant's motion, Plaintiff's response, Defendant's reply, the declarations and exhibits attached thereto, and the remainder of the record, the Court hereby finds and ORDERS:

(1) Defendant's Motion for Summary Judgment (Dkt. #290) is DENIED.

(2) The Clerk shall forward a copy of this Order to all counsel of record.

DATED this 16th day of July, 2008.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE